1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                              DISTRICT OF NEVADA

8                                      * * *
                                         )
9    GUY GRIMSLEY,                       )
                                         )
10                  Plaintiff,           )          3:08-CV-00482-LRH-VPC
                                         )
11   v.                                  )
                                         )          ORDER
12   CHARLES RIVER LABORATORIES, a       )
     Delaware corporation, and DOES I-V; )
13   BLACK & WHITE CORPORATIONS I-V;     )
     ABLE & BAKER PARTNERSHIPS,          )
14   inclusive,                          )
                                         )
15                  Defendants.          )
                                         )
16   _____ )
                                         )
     CHARLES RIVER LABORATORIES, a       )
17   Delaware corporation,               )
                                         )
18                  Counter-claimant,    )
                                         )
19   v.                                  )
                                         )
20   GUY GRIMSLEY,                       )
                                         )
21                  Counter-defendant.   )
     _____ )
22

23          Before the court is Defendant Charles River Laboratories' Motion for Summary Judgment

24   (#64[1]), along with Plaintiff Guy Grimsley's opposition (#75), and Defendant's reply (#89).  Also

25   _____

26          [1]Refers to the court's docket entry number.

1  before the court are Plaintiff's motions to exceed page limits on its opposition (#74) and to

2  supplement its opposition (#77), and Defendant's motion to exceed page limits on its reply (#88).

3  Good cause appearing, the motions to supplement and exceed page limits shall be granted *nunc pro*

4  *tunc*, and the briefing on summary judgment shall be considered accordingly.

5  **I.      Facts and Procedural History**

6          This action arises out of Plaintiff Guy Grimsley's employment as Director of Laboratory

7  Sciences with Defendant Charles River Laboratories in Sparks, Nevada.  Grimsley was born in

8  England, lived in the United Kingdom for thirty years before moving to Australia to obtain his

9  Ph.D. in pathology and immunology, has citizenship in both countries, and has been a laboratory

10 scientist for nearly fifty years.  Charles River is a global provider of research and services that

11 advance drug discovery and development, some of which involve animal testing.

12         Grimsley was hired by Charles River in November 2006.  As part of the hiring process,

13 Grimsley submitted a written application for employment and flew to Reno to interview with the

14 local management team including Dr. Stephen K. Durham.  Durham was Divisional Vice President

15 and the General Manager of the Preclinical Services facility in Reno, and would be Grimsley's

16 immediate supervisor.  Durham made the final decision to hire Grimsley, who was offered the

17 position on November 9.  Durham initially discussed the offer with Grimsley over the phone, and it

18 was confirmed in an offer letter signed by Durham and Director of Human Resources Shauna

19 Douglass, which was emailed to Grimsley the same day.  (Doc. #75-6, Ex. 8.)  The offer stated,

20 *inter alia*, that Grimsley would be "an employee at will," and that while Charles River would

21 reimburse him for up to $15,000 in moving expenses, repayment would be required if his

22 employment "should terminate for any reason" within one year.  (Doc. #75-6, Exh. 7.)  Following a

23 string of emails between Grimsley, Durham and Douglass regarding the meaning of and possibly

24 changing the term "for any reason," Grimsley accepted the offer by signing and returning the

25 agreement on November 10, with his employment to commence December 5.  (Doc. #75-6, Exh.

26 8.)

Grimsley's employment lasted less than a year, ending October 5, 2007.  Charles River contends that Grimsley's termination was due to his failed leadership as Director of Laboratory Sciences, a department with approximately thirty employees and with a scientific staff that was predominantly female.  Charles River points to multiple hostile work environment complaints by Grimsley's subordinates stemming from his persistent use of derogatory gender stereotypes, the resignations of two employees and the threatened resignation of four others who complained about Grimsley's behavior, and Grimsley's failure to repair his relationships with his team members, despite the efforts of Durham and Douglass to resolve the situation through a series of meetings with Grimsley and the employees involved.

On September 27, 2007, Douglass assessed the situation in an email to Durham and Ross Gibson, Senior Director of Human Resources.  She stated, among other things: "in my opinion, we are fast approaching a core melt down in the Lab Science group"; Grimsley "does not seem to understand or appreciate the need to openly communicate with the scientific staff" and "continually makes inappropriate comments and accusations of staff at all levels"; a male employee who had joined Grimsley's department as his "right hand person" one month prior was already considering leaving due to limitations placed on him by Grimsley that defeated the purpose of his role; two other female employees were "very close to tears," "beyond frustrated with the ongoing level of incompetence, lack of clear direction and the quality of the scientific product," and considering transferring departments "OR leaving the company"; "[o]n balance, the scientific staff in Lab Sciences does not have any hope that [Grimsley] is capable of managing and providing direction to the group moving forward"; "[t]here is a sense of constant tension and confusion"; and Douglass would do what she could to keep the three employees "from jumping ship."  (Doc. #64, Exh. D.)

Durham accordingly determined that Grimsley had failed as a leader of the scientific staff and decided that he should be terminated.  Although Grimsley could not be terminated without the approval of corporate HR and corporate legal counsel, Durham had the sole authority to decide that Grimsley should be terminated, without which it would never have gone to corporate for approval.

On October 5, 2007, Grimsley was informed of his termination in a meeting with Durham and Douglass, he was given a written severance offer with 21 days to accept it, and they agreed to meet Monday morning, October 8, to discuss his proposal to retire, rather than be involuntarily terminated. (Doc. #64, Exh. EE.) That meeting did not occur, however, and in an October 17 letter from Douglas, Grimsley was informed that the severance offer was withdrawn and his employment was deemed to have ended October 5. (Doc. #64, Exh. FF.)

Grimsley disputes the above-stated reasons for his termination. He admits he made certain comments that were perceived as sexist but that all such incidents were resolved to the satisfaction of everyone involved. He also points out that at the end of June 2007 he was given an "exceptional" six-month performance review, as the revenue metrics were on target at three times the previous year's level, and he would have been given entitled to the maximum employee bonus had he finished the 2007 year. (Doc. #75, Exh. 1, Grimsley Depo. at 150; Doc. #75, Exh. 3, Douglass Depo. at 65-66.) Grimsley contends that his termination was instead motivated by his European philosophies on the treatment of test animals, by his refusal to participate in the mistreatment test of animals, as a means to prevent him from publicly disclosing such mistreatment, or by his age.

Regarding the treatment of animals, Grimsley believes that "there is a more humane attitude to animals in England than perhaps in America" based on his "observation of some of the practices that are going on in the U.S. with animals not so much in these facilities but how people are involved in fighting animals," and he "just know[s] that the English are very eccentric when it comes to animals and the way they look after them." (Doc. #75, Exh. 1, Grimsley Depo. at 130-31.) Grimsley had voiced concerns that descriptions of test animal mistreatment were redacted from a final Quality Control Report after having been included in the April 2007 draft report. Grimsley also voiced objections at an annual meeting regarding a company directive that if existing or prospective clients inquired about why test dogs were being housed in cages, they should say that such housing was only temporary and that the dogs would be housed in runs according to the

4

European standard, which Grimsley knew to be false.  (*Id.* at 142-43.)  Grimsley thinks "keeping dogs in cages is a little cruel" but does not know whether it violates any regulations on the treatment of test animals.  (*Id.* at 143.)  Charles River did not actually begin housing dogs until mid-October 2007, approximately two weeks after Grimsley's termination.

Grimsley also thinks that his age was "a contributing factor" in his termination.  (*Id.* at 106.)  On October 2, three days before his termination, Grimsley publicly disclosed his age at an awards meeting also attended by other members of senior management.  During a lecture by a guest speaker on the changing nature of the employment demographic and differences between workers in different age groups, Grimsley was the only person in the room who raised his hand as a "traditionalist" born before 1943, which meant he was at least 64.  (*Id.* at 107.)  After the meeting, a fellow director and Grimsley's equal in the company asked him, "Do you realize you're an outlier?"  (*Id.*)  To scientists like them, the term "outlier" means "something that doesn't fit in with a set of data" or "into the general population group."  (*Id.* at 110.)  At the time, Grimsley "thought not a great deal of it" and "laughed it off."  (*Id.* at 107, 111.)  He also believes that Douglass already knew how old he was, and that Durham probably knew when he hired Grimsley.  (*Id.* at 108-09.)  Nonetheless, Grimsley's believes that his age motivated his termination based on the proximity in time between the October 2 meeting and his October 5 termination, and the fact that Durham likely decided to terminate Grimsley sometime after the meeting because Durham's boss was unaware of his termination as of the afternoon of October 3.  (*Id.* at 108.)  Grimsley "think[s] [Durham] was embarrassed by the fact that he had brought on somebody as the head of a new department who was 64 years old."  Although Durham did not say he was embarrassed, Grimsley theorizes that "[p]eople often view it as a funny decision to employ somebody of that age in a new job" and that "there's a difference between him knowing my age and everybody else knowing."  (*Id.* at 109.)

According to Grimsley, when he was terminated on October 5, Durham said that "things weren't working out," he wasn't "a good fit," and that "[s]omebody is going to resign."  (*Id.* at 199,

203.)  Douglass also said, "Well, Guy, I think it's cultural," she said it twice to emphasize the point, and both Durham and Douglass "said how much they liked [him]."  (*Id.* at 203.)  Later that day, Grimsley sent Douglass an email asking, "Could you please explain what you meant this morning when you repeated several times that the reason for my termination was mainly cultural?" but he received no response.  (*Id.*; Doc. #75, Exh. 17.)

Grimsley believes that following his termination he was replaced by the aforementioned male employee who had been brought in just one month prior as Grimsley's "right hand person" and who was considering resigning.  Grimsley estimates that his replacement was in his early forties.

Grimsley later filed this wrongful termination action under state and federal law.  His complaint is organized into six causes of action: (1) national origin and/or age discrimination under Title VII and state law; (2) age discrimination under the ADEA and state law; (3) breach of contract; (4) promissory estoppel; (5) breach of the implied covenant of good faith and fair dealing; and (6) tortious discharge.  (Doc. #1.)  In response, Charles River has asserted counterclaims for (1) breach of contact, based on Grimsley's failure to repay $15,000 in moving expenses; and (2) conversion, based on Grimsley's retention of or failure to return immediately company property, including his laptop computer, cell phone, and proprietary or confidential documents.  (Doc. #9.) Charles River now moves for summary judgment on all claims and counterclaims.

## II.    Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, answers to interrogatories, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita*

1   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora*

2   *Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

3        The moving party bears the initial burden of informing the court of the basis for its motion,

4   along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v.*

5   *Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the

6   moving party must make a showing that is "sufficient for the court to hold that no reasonable trier

7   of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259

8   (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

9        To successfully rebut a motion for summary judgment, the non-moving party must point to

10  facts supported by the record which demonstrate a genuine issue of material fact.  *Reese v.*

11  *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might

12  affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

13  242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary

14  judgment is not appropriate.  *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute

15  regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could

16  return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a

17  scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute;

18  there must be evidence on which a jury could reasonably find for the party. *Id.* at 252.

19  **III.   Discussion**

20       **A.  National Origin Discrimination**

21       Title VII makes it unlawful for an employer to "discharge any individual . . . because of

22  such individual's . . . national origin."  42 U.S.C. § 2000e-2(a)(1); *accord* N.R.S. § 613.330(1)(a).

23  Grimsley disclaims any allegation that his termination was motivated by any animus against people

24  of English or European descent.  (Doc. #75, Exh. 1, Grimsley Depo. at 104-05.)  Instead, he claims

25  that he was terminated because of his "views on the treatment of animals," which he holds based on

26  his English heritage.  (*Id.*)  Although Grimsley does not present any direct evidence that such views

motivated his termination, he infers that this is what Douglass was referring to when she referenced "cultural" differences during his termination meeting.  (*Id.*)

Even assuming that the reference to "cultural" differences could be reasonably construed as a reference to Grimsley's views on the treatment of animals, rather than his management style, and that such views in fact motivated his termination, such allegations cannot support a claim that Charles River discriminated against him because of his national origin.  Grimsley does not claim that he was terminated because of national origin animus or stereotyping.  Instead, he asserts that he was terminated because he in fact held certain views on the treatment of animals, which he attributes to his national origin, and because he made those views known to his colleagues by opposing certain practices by Charles River regarding the housing and treatment of test animals.  But Title VII and N.R.S. § 613.330 do not prohibit discrimination based on personal beliefs, despite the fact that such beliefs may be derived from or influenced by one's national origin.  *See Lopez v. Bd. of Trustees of the Univ. of Ill. at Chicago*, 344 F. Supp. 2d 611, 621 (N.D. Ill. 2004) (holding that denial of tenure based on a professor's political views of Cuba, rather than because he was Cuban or a Cuban exile, cannot support a claim for national origin discrimination).  Grimsley's claim of national origin discrimination therefore fails.

**B.  Age Discrimination**

Grimsley next claims that he was terminated because of his age.  The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer "to discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1); *accord* N.R.S. § 613.330(1)(a).  To prevail on an ADEA claim, the plaintiff must establish "that age was the 'but-for' cause of the employer's adverse action."  *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009); *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000).  Thus, in contrast to Title VII, the ADEA also does not authorize mixed-motives claims where age is merely a motivating factor.  *Gross*, 129 S. Ct. at 2350-51 (2009).  Age need not be the *sole* cause, however.  *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010).  Mixed-motives claims are permitted

8

under the ADEA.  But "the burden of persuasion . . . is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action.  A plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer action." *Gross*, 129 S. Ct. at 2351.  "That is, the plaintiff's age must have 'actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome.'" *Reeves*, 530 U.S. at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).  Thus, "an employer may be held liable under the ADEA if other factors contributed to its taking an adverse action, as long as 'age was the factor that made a difference.'" *Jones*, 617 F.3d at 1277-78 (quoting *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010)).

### 1.    Applicability of the *McDonnell Douglas* Burden-Shifting Framework

Before reaching the merits of Grimsley's claims, the court must first resolve the parties' dispute regarding the applicable analytical framework and the parties' respective burdens of production and persuasion.  Grimsley contends that to avoid summary judgment a plaintiff need not prove that age discrimination was the "but-for" cause of the discharge despite the Supreme Court's holding in *Gross*, as *Gross* does not affect the application of the burden-shifting evidentiary framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), per the Tenth Circuit's holding in *Jones*, 617 F.3d at 1278-79.  Charles River disagrees that *McDonnell Douglas* still applies.  It points to the Supreme Court's holding in *Gross* that Title VII's burden-shifting framework does not apply to ADEA claims, such that the plaintiff always retains the burden of persuasion.  129 S. Ct. at 2352.

Neither party is correct.  The *Gross* Court's rejection of the Title VII burden-shifting framework of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), was not a rejection of the *McDonnell Douglas* burden-shifting evidentiary framework.  Charles River's argument to the contrary misreads *Gross* and erroneously conflates the two frameworks by confusing the burdens of persuasion and production.  Whereas *Price Waterhouse* shifted the burden of *persuasion* in mixed-motives cases, *see* 490 U.S. at 258, *McDonnell Douglas* shifts only the burden of *production* and

leaves the burden of persuasion at all times with the plaintiff. *See Reeves*, 530 U.S. at 142; *Jones*, 617 F.3d at 1278; *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). Accordingly, in *Gross*, the Court gave separate treatment to the two burden-shifting frameworks. The Court rejected application of the *Price Waterhouse* framework in the ADEA context and held that the burden of persuasion never shifts to the employer. 129 S. Ct. at 2348-49. But it left open the question "whether the evidentiary framework of *McDonnell Douglas* . . . utilized in Title VII cases is appropriate in the ADEA context." *Id.* at 2349 n.2. Thus, as the Tenth Circuit held in *Jones*, although "*Gross* created some uncertainty regarding burden-shifting in the ADEA context, ...it does not preclude [the] continued application of *McDonnell Douglas* to ADEA claims." 617 F.3d at 1278; *accord Hill v. The Boeing Co.*, 765 F. Supp. 2d 1208, 1215-16 (C.D. Cal. 2011); *Kelley v. City of Lake Havasu*, 2009 WL 4508523, *3 (D. Ariz. 2009).

Grimsley's position is therefore correct insofar as the court may apply the *McDonnell Douglas* framework in assessing his ADEA claim, notwithstanding *Gross*. *See Reeves*, 530 U.S. at 142 ("we shall assume, *arguendo*, that the *McDonnell Douglas* framework is fully applicable here"). But Grimsley is incorrect that in applying the *McDonnell Douglas* framework on a summary judgment posture the court should disregard the holding of *Gross* that in all ADEA cases, whether mixed motive or otherwise, the plaintiff has the burden of persuasion to prove by a preponderance of the evidence that age discrimination was the "but-for" cause of the adverse employment action. 129 S. Ct. at 2351.

As noted above, *McDonnell Douglas* establishes only a burden-shifting framework for the production of evidence; it does not affect the burden of persuasion. *Gross* does not alter the elements of a prima facie case of discrimination as the first step of the *McDonnell Douglas* framework. *Carden v. Chenega Sec. & Protection Servs., LLC*, 2011 WL 1807384, *5 n.2 (E.D. Cal. 2011). But once plaintiff has established a prima facie case and the employer has satisfied its burden of production by offering admissible evidence of a legitimate, nondiscriminatory motive, the *McDonnell Douglas* framework, with its presumptions and burdens, disappears and "the sole

10

remaining issue [is] 'discrimination *vel non*.'" *Reeves*, 530 U.S. at 142-43 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)).  At that point, the plaintiff must confront its ultimate burden of persuasion, *see id.*, tempered only by the ordinary standards of summary judgment, which require the nonmoving party to present sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. Accordingly, to withstand summary judgment on an ADEA claim, the plaintiff must produce admissible evidence sufficient such that a reasonable jury could find "by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer action." *Gross*, 129 S. Ct. at 2351.  The plaintiff may attempt to satisfy that burden by presenting, in addition to its prima facie case, indirect evidence that the legitimate reasons offered by the employer are not worthy of credence and thus a pretext for discrimination.  *See Reeves*, 530 U.S. at 143, 147-48.  But the plaintiff must satisfy that burden nonetheless.

## 2.   Discussion

Applying *McDonnell Douglas* here, Grimsley has produced sufficient evidence to establish a prima facie case of age discrimination: (1) at the time he was fired, Grimsley was 64 years old and thus a member of the class protected by the ADEA, *see* 29 U.S.C. § 631(a) ("at least 40 years of age"); (2) he was otherwise qualified for the position of Director of Laboratory Sciences; (3) he was terminated by Charles River; and (4) his duties were assumed by an employee in his early forties with equal or inferior qualifications.  *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir. 1994) (listing the elements and noting that "very little evidence is required to establish a *prima facie* case").  In turn, Charles River has produced admissible evidence that it terminated Grimsley for legitimate, nondiscriminatory reasons: he was the subject of repeated complaints by his colleagues regarding sexual harassment, ineffective communication and a domineering management style, several employees had resigned or were threatening to resign, and as a result Douglass and Durham concluded that Grimsley had failed as a leader.  Grimsley must therefore present sufficient direct or circumstantial evidence such that a reasonable jury could return a verdict

in his favor.  Because Grimsley has presented no direct evidence of discriminatory intent and relies solely on circumstantial evidence, "that evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment."  *Coghlan v. Am. Seafoods Co LLC*, 413 F.3d 1090, 1095-96 (9th Cir. 2005) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)).

Grimsley's "burden is especially steep in this case because of the so-called 'same actor inference.'"  *Coghlan v. Am. Seafoods Co LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005).  "[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action."  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996).  The inference is based on the principle that "an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs."  *Coghlan*, 413 F.3d at 1096.  It is "neither a mandatory presumption . . . nor a mere possible conclusion for the jury to draw . . . .  Rather, it is a 'strong inference' that a court must take into account on a summary judgment motion."  *Id.* at 1098 (citing *Bradley*, 104 F.3d at 271).  A "strong case of bias [is] necessary to overcome this inference."  *Id.*

Here, the evidence is uncontroverted that the person principally responsible for Grimsley's hiring and firing was Durham, his direct supervisor, that Durham probably knew Grimsley's age when he was hired, and that those decisions were made just one year apart.  *See id.* at 1097 (also involving a one-year time span).  Granted, others were involved in the processes leading to both actions.  Grimsley was interviewed by multiple individuals who undoubtedly made recommendations regarding his hiring, but Durham made the hiring decision and personally extended the offer.  Also, the evidence reflects that Douglass recommended to Durham that Grimsley should be terminated, and Durham's decision to terminate Grimsley could not have been carried out without the approval of corporate HR and legal.  In that sense, Durham himself termed his decision a "recommendation."  But Durham also testified that in the sense of where the "buck

stopped" on whether to terminate or not to terminate, that decision was Durham's alone, and the matter would not have gone to corporate for approval without his decision.  (Doc. #75, Exh. 9, Durham Depo. at 74-75.)

Even granting the fact that Durham did not have the final say in Grimsley's termination insofar as his decision required corporate approval, applying the same actor inference here is consistent with both the principle underlying the inference and the requirement of "but for" causation under *Gross*.  But for Durham's decision as Grimsley's direct supervisor, Grimsley's termination would not have gone to corporate for approval.  Moreover, Grimsley's own case is supported by only two lines of argument, both of which lead back to Durham: first, that Grimsley publicly disclosed his age at a conference just days before his termination, prompting a colleague to comment that he was "an outlier" and possibly causing Durham to be embarrassed for having hired a manager of such advanced age; and second, that the legitimate, nondiscriminatory reasons cited by Douglass and Durham as motivating Douglass' recommendation and Durham's decision are false and thus a pretext for age discrimination.  Meanwhile, Grimsley has presented no evidence that anyone in corporate HR or legal even knew of Grimsley's age or had any input into the reasons for Grimsley's termination; they simply approved Durham's decision.  Thus, because the uncontroverted evidence establishes that Durham was the central decision-maker and Grimsley would not have been terminated but for Durham's decision, the fact that Durham hired him less than a year prior "is strong evidence" that Grimsley's termination was not the result of any bias against the protected class to which he belongs.  *Coghlan*, 413 F.3d at 1096.

Turning to the evidence presented by Grimsley to support his claim, the court finds that Grimsley has failed to present any "specific and substantial" circumstantial evidence that age discrimination contributed to his termination.  *Coghlan*, 413 F.3d at 1095-96.  First, Grimsley cites the comment by a colleague, who was "an equal" and had nothing to do with his termination, that he was "an outlier."  But stray or isolated remarks not tied to an adverse employment decision are insufficient to support an inference of discriminatory motive.  *Nidds v. Schindler Elevator Corp.*,

13

113 F.3d 912, 918 (9th Cir. 1997) ("old timers"); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (comment that "[w]e don't necessarily like grey hair" uttered in an ambivalent manner and not directly tied to termination "is at best weak circumstantial evidence of discriminatory animus").  Indeed, even Grimsley himself interpreted the "outlier" comment as merely an observation by a fellow scientist regarding the data set of employees, not a reflection of any animus.

Second, Grimsley testified, "I think [Durham] was embarrassed" by the public revelation that he hired a 64-year-old to head the Laboratory Sciences department.  (Doc. #75, Exh. 1, Grimsley Depo. at 108-09.)  But Grimsley's subjective belief, based on nothing but his own theories and speculation about what others might be thinking, is not evidence of discriminatory animus.

Third, Grimsley points to the fact that he was terminated just days after the public disclosure of his age.  While in some circumstances temporal proximity can support an inference of motive, any such inference is particularly weak on this record.  It is uncontroverted that just days prior to Grimsley's public disclosure of his age, Douglass sent an email to Durham and corporate HR cataloguing a litany of problems related to Grimsley and vowing to do what she could to keep three employees from resigning.  (Doc. #64, Exh. D.)  The process leading to Grimsley's termination was therefore already in motion, and there is no evidence to suggest that the public disclosure of his age had any effect on the course of that process.  To the contrary, the reasons given to Grimsley for his termination are consistent with the problems discussed in Douglass' email.

Finally, absent any evidence affirmatively suggesting that his termination was motivated by age discrimination, Grimsley contends that the legitimate, nondiscriminatory reasons given by Charles River are false and thus, by negative inference, are a pretext for discrimination.  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  *Reeves*, 530 U.S. at

147. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.*

Here, however, Grimsley has failed to establish that the reasons given for his termination were unworthy of credence. The evidence is uncontroverted that multiple employees were in fact threatening to resign due to problems with Grimsley, and Grimsley was accordingly told during his termination meeting that it "wasn't a good fit" and "[a] couple of people are threatening to quit." (Doc. #75, Exh. 1, Grimsley Depo. at 199.) The fact that Grimsley had met his financial targets, though relevant to his overall job performance, is just one aspect of that performance and does not contradict the assessment of Durham and Douglass that Grimsley had failed as a leader with respect to the people in his department. Nor does the fact that in June 2007 Grimsley received a positive six-month review as a result of meeting his financial targets contradict the facts that his female employees had made complaints about inappropriate remarks, that those incidents were addressed in a series of meetings with Durham, and that he failed to repair his relationships with his employees, ultimately leading to Douglass' grim assessment in September 2007 that "we are fast approaching a core melt down in the Lab Science group." (Doc. #64, Exh. D.)

Grimsley also points to Charles River's supplemental position statement to the Nevada Equal Rights Commission, in which Charles River stated: "A formal investigation was not conducted into the allegations against Mr. Grimsley. We felt that the situation was handled appropriately and satisfactorily to all involved through the meetings held by the General Manager, Human References [sic], Mr. Grimsley and the victims." (Doc. #75, Exh. 5.) Grimsley contends that this constitutes an admission that the reasons given for his termination were false. The statement is not amenable to such an interpretation, however. It was made only in response to the NERC's request for copies of any documentary evidence related to the allegations of sexual harassment by Grimsley that were made in Charles River's initial position statement to NERC. (Doc. #75, Exh. 4.) That initial position statement stated that Grimsley was terminated "because he failed to meet the Company's expectations for treating employees in a non-discriminatory manner,"

15

that he "had on a number of occasions made derogatory and sexist remarks to staff members, which "created constant tension and confusion" in his department, and that one employee had resigned and that three others were threatening to leave the department or resign "because of Grimsley's behavior, including one employee who alleged that Mr. Grimsley created a hostile work environment." (Doc. #75, Exh. 2 at 1.)  Charles River's supplemental letter contains no repudiation of these allegations.  Nor can it be construed as a repudiation given the context in which it was made—as a request for documentation related to any formal investigation—and the undisputed facts that employees had in fact complained of inappropriate remarks and that Durham and Douglass addressed the problem through meetings, rather than a formal investigation.  Nor does the supplemental statement even address the undisputed facts that just prior to Grimsley's termination multiple employees were threatening to resign and that Grimsley's relationships with his staff remained in disrepair.

For all these reasons, Grimsley has failed to present sufficient evidence upon which a reasonable jury could find that he was terminated because of his age.  Although he has presented a prima facie case, he has failed to produce any direct evidence or any specific and substantial circumstantial evidence of age discrimination, or to establish that Charles River's legitimate, nondiscriminatory reasons were pretextual.  His claim of age discrimination therefore fails.

### C.  Breach of Contract

Grimsley next claims that Charles River breached his employment contract by terminating him without due cause, in violation of Nevada law.  "[A]ll employees in Nevada are presumptively at-will employees." *Martin v. Sears, Roebuck & Co.*, 899 P.2d 551, 554 (Nev. 1995).  "This presumption may be rebutted by proving, by a preponderance of the evidence, that there was an express or implied contract between the employer and the employee which indicates that the employer would only terminate the employee for cause." *Id.*  Here, Grimsley's offer letter confirmed the Nevada presumption, expressly stating: "This letter does not constitute an employment contract with Charles River and you will be, at all times, an employee at will." (Doc.

#75, Exh. 7 at 2.)  Grimsley accepted the offer by signing and returning the letter, without change. Accordingly, absent modification of this provision, Grimsley was an at-will employee and could be terminated "at any time and for any reason or no reason."  *Martin*, 899 P.2d at 553.

Grimsley claims that a written and oral modification was made through a telephone conversation with Douglass and through his email exchange with Durham and Douglass, such that he could be terminated only for "due cause," meaning "a very high level/degree of misconduct." (Doc. #75, Exh. 8.)  There is no merit to this contention under Nevada law.  First, while parol evidence is admissible to ascertain the meaning of ambiguous terms, it is inadmissible to explain or contradict the unambiguous terms of a written contract, like the "at-will" employment clause at issue here.  *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 21-22 (Nev. 2001).  Second, parol evidence also may be introduced to prove the existence of a subsequent agreement to modify a written contract.  *M.C. Multi-Family Dev., LLC v. Crestdale Assocs., Ltd.*, 193 P.3d 536, 545 (Nev. 2008). But the conversation and emails here preceded Grimsley's acceptance of the offer, and Grimsley executed the contract without any amendments.  "The parol evidence rule forbids the reception of evidence which would vary or contradict the contract, since all prior negotiations and agreements are deemed to have been merged therein."  *Daly v. Del E. Webb Corp.*, 609 P.2d 319, 320 (Nev. 1980).  Third, parol evidence also may be introduced to prove the existence of an extrinsic agreement as to any matter on which the written contract is silent, and which is not inconsistent with its terms.  *M.C. Multi-Family*, 193 P.3d at 545; *Kaldi*, 21 P.3d at 22.  But neither condition applies here.

Because the parol evidence offered by Grimsley is inadmissible to contradict the express terms of his at-will employment agreement, he was an at-will employee terminable at any time, for any reason or no reason.  His breach of contract claim therefore fails.

**D. Promissory Estoppel**

Grimsley's claim of promissory estoppel fails for much the same reasons.  "The doctrine of promissory estoppel, which embraces the concept of detrimental reliance, is intended as a substitute

17

for consideration, and not as a substitute for an agreement between the parties." *Vancheri v. GNLV Corp.*, 777 P.2d 366, 369 (Nev. 1989). Here, the only admissible evidence of the parties' agreement establishes that Grimsley's employment was at-will.

### E. Breach of the Implied Covenant of Good Faith and Fair Dealing

Grimsley next claims that Charles River breached the implied covenant of good faith and fair dealing by breaching the employment contract and its promise to terminate him only for due cause. Because such a claim requires an enforceable contract and is not applicable to at-will employment, Grimsley's claim fails. *Martin*, 899 P.2d at 555.

### F. Public Policy Tortious Discharge

Grimsley finally claims that he was tortiously discharged in violation of Nevada public policy. Nevada recognizes such a common law cause of action as an exception to the at-will employment doctrine. *Wayment v. Holmes*, 912 P.2d 816, 818 (Nev. 1996). However, "public policy tortious discharge actions are severely limited to those rare and exceptional cases where the employer's conduct violates strong and compelling public policy." *Sands Regent v. Valgardson*, 777 P.2d 898, 900 (Nev. 1989). "To support a claim of tortious discharge, the evidence produced by the employee must be concrete and establish outrageous conduct that violates public policy." *State v. Eighth Jud. Dist. Ct. (Anzalone)*, 42 P.3d 233, 240 (Nev. 2002). Qualifying public policy violations include discharging an employee for filing a workmen's compensation claim, *Hansen v. Harrah's*, 675 P.2d 394, 397 (Nev. 1984); for refusing to work under unreasonably dangerous conditions, *D'Angelo v. Gardner*, 819 P.2d 206, 216 (Nev. 1991); and for reporting or refusing to participate in illegal activity, *Allum v. Valley Bank of Nev.*, 970 P.2d 1062, 1069 (Nev. 1998). By contrast, the Nevada Supreme Court has declined to recognize a common law cause of action for tortious discharge in age discrimination cases due to the availability of statutory remedies, *Sands*, 777 P.2d at 899-900; where an assistant district attorney was terminated for conduct that exceeded his ethical obligations and constituted insubordination, *Wayment*, 912 P.2d at 818-19; and in

18

"mixed motives" cases where the employee's protected conduct is not "*the* proximate cause of his discharge," *Allum*, 970 P.2d at 1066.

Grimsley claims that Nevada has a strong and compelling public policy against discharging an employee (1) to prevent public disclosure of illegal and cruel mistreatment of laboratory animals, and (2) for refusing to engage in cruel and inhumane mistreatment of animals.  (Doc. #1, Complaint ¶ 49.)  Specifically, Grimsley objected to having to falsely tell clients that test dogs would be housed in dog runs rather than cages, and he objected that reports of animal mistreatment were redacted from an audit report.

Grimsley's claim that he was terminated to prevent public disclosure of animal mistreatment is essentially a claim of preemptive retaliation for whistleblowing.  Although Nevada recognizes a claim for retaliatory discharge for whistleblowing, the employee must have "reasonably suspected, in good faith, that [the employer] participated in illegal conduct," *Allum*, 970 P.2d at 1067, and must have actually reported the misconduct to "the appropriate authorities," rather than internally, *Wiltsie v. Baby Grand Corp.*, 774 P.2d 432, 433-34 (Nev. 1989).  "The public policy advanced in the whistleblowing context is the enforcement of the state's laws." *Bielser v. Prof'l Sys. Corp.*, 321 F. Supp. 2d 1165, 1171 (D. Nev. 2004).  "[C]learly the goal of enforcing the state's laws is best served by requiring employees to report the illegal activity to the relevant authority outside the company." *Id.* at 1172.  Here, Grimsley concedes that his objections were made only internally, and he never reported the alleged misconduct to the appropriate authorities, whether before or after his termination.  Also, Grimsley has presented no evidence that he believed the misconduct was actually illegal.  For either reason, his whistleblowing claim fails.

Grimsley also claims that his objections also constituted a refusal to participate in misconduct.  "A claim for tortious discharge [is] available to an employee who was terminated for refusing to engage in conduct that he, in good faith, reasonably believed to be illegal." *Allum*, 970 P.2d at 1068.  Because Grimsley has presented no evidence that he believed the conduct he refused to participate in was illegal, this claim fails.

19

**G.  Counterclaim: Breach of Contract**

Charles River counterclaims for breach of contract based on Grimsley's failure to repay $15,000 in moving expenses.  As set forth in Grimsley's offer letter, which Grimsley signed without alteration, Charles River agreed to reimburse his relocations expenses up to $15,000, subject to Grimsley's agreement that he would have to repay this amount in full if his employment "should terminate for any reason" within two years.  (Doc. #75, Exh. 7.)  It is undisputed that Charles River reimbursed Grimsley for relocation expenses in the amount of $15,000, that Grimsley was terminated within one year, and that he has not repaid the $15,000.

Nonetheless, Grimsley contends that his email exchange with Durham and Douglass prior to signing the offer letter constitutes a modification to the agreement, and that pursuant to that modification repayment of moving expenses was required only if he were terminated for "due cause."  As the court has already held, however, the parol evidence rule prohibits the consideration of evidence of negotiations prior to the execution of a written agreement that would contradict its unambiguous terms.  *See supra* Part C.

Thus, contrary to Grimsley's argument, there are no genuine issues of material fact as to whether his employment agreement was modified to require termination for due cause.  Based on the undisputed facts presented, Grimsley's failure to repay the $15,000 in moving expenses constitutes a breach of his employment agreement, and Charles River is entitled to judgment as a matter of law on its counterclaim.

**H.  Counterclaim: Conversion**

Charles River also claims that Grimsley is liable for conversion for wrongfully retaining company property.  Although Charles River's complaint alleges a failure to return a long list of items, the present motion alleges only that Grimsley returned his company-issued laptop computer and cell phone in an untimely manner, and that he continues to possess confidential or propriety documents.  (Doc. #64, p. 38.)

"A conversion occurs whenever there is a serious interference to a party's rights in his property." *Bader v. Cerri*, 609 P.2d 314, 317 (Nev. 1980), *overruled on other grounds by Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1050-51 (Nev. 2000). It is "an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge." *Id.* Both tangible and intangible personal property may be subject to a conversion claim. *M.C. Multi-Family*, 193 P.3d at 543.

Return of converted property "does serve to mitigate damages" but "does not nullify the conversion." *Bader*, 609 P.2d at 317. This presumes there is a conversion in the first place, however, which requires more than mere retention of another's property. Rather, the retention must constitute a "serious interference" to the owner's rights. *Id.* at 317; *see also* Restatement (Second) of Torts § 222A(1) ("so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel"). "There may be trivial and unimportant detentions of chattels which are not so serious as to amount to a conversion." Restatement (Second) of Torts § 237, cmt. a. Relevant factors include the extent and duration of the interference, the actor's intent to assert a right inconsistent with the owner's right of control, the actor's good faith, the harm done to the chattel, and the inconvenience and expense caused to the owner. *Id.* § 222A(2). "Whether a conversion has occurred is generally a question of fact for the jury." *Evans*, 5 P.3d at 1048.

Here, Charles River, as the counter-claimant and party moving for summary judgment, has failed to present evidence sufficient for the court to hold that no reasonable jury could find that Grimsley's retention of the property at issue did not constitute a serious interference with Charles River's rights. Disputed issues of fact remain regarding any grace period afforded Grimsley for the return of company property and whether he acted reasonably in light of Charles River's representations regarding the deadlines it established for responding to the severance offer and returning the property. Furthermore, Charles River has made no showing whatsoever that Grimsley

21

asserted any rights in the property, that any harm was done to the property, or that it suffered any inconvenience or expense.

Regarding the documents in particular, Charles River has made no showing that Grimsley has retained anything more than copies and has deprived the company of their use, that he has wrongfully disclosed any materials to third parties, or that he has breached any confidentiality or other agreement. Charles River's assertion that Grimsley's retention of documents for litigation purposes constitutes a conversion is not supported by the authorities cited. None are conversion cases. And the propositions for which they stand—that document retention for litigation or whistleblowing purposes is no defense to a breach of contract action based on an express agreement regarding proprietary or confidential material, *see JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 697, 705 (E.D. Va. 2007), and is not protected conduct for purposes of a retaliation action, *see Hodgson v. Texaco Inc.*, 440 F.2d 662, 663 (5th Cir. 1971); *Jeffries v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1036-37 (5th Cir. 1980)—are beside the point. Charles River asserts no claim and makes no showing that Grimsley has breached any contractual obligation, and Grimsley does not claim retaliation based on his retention of the documents.

Summary judgment is therefore inappropriate.

**IV.    Conclusion**

For the foregoing reasons, Charles River is entitled to summary judgment an all six of Grimsley's causes of action, and on its counterclaim for breach of contract. Charles River is not entitled to summary judgment, however, on its counterclaim for conversion.

IT IS THEREFORE ORDERED that Plaintiff's motion to exceed page limits (#74), Plaintiff's motion to supplement its opposition (#77), and Defendant's motion to exceed page limits (#88) are GRANTED *nunc pro tunc*.

///

///

///

1         IT IS FURTHER ORDERED that Defendant Charles River Laboratories' Motion for

2    Summary Judgment (#64) is GRANTED in part and DENIED in part.

3         IT IS SO ORDERED.

4         DATED 27th day of September, 2011.

5

6

7    _____

8    LARRY R. HICKS
    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26